Melissa A. Fortunato (SBN 319767)
Email: fortunato@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
445 S. Figueroa Street, Suite 3100
Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506

*Attorney for Plaintiff*

[Additional Counsel on Signature Page]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HAYDON MODGLIN, Derivatively on Behalf of Nominal Defendant LOANDEPOT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ANTHONY HSIEH, PATRICK FLANAGAN, NICOLE CARRILLO, ANDREW C. DODSON, JOHN C. DORMAN, BRIAN P. GOLSON, AND DAWN LEPORE,<br><br>Defendants,<br><br>-and-<br><br>LOANDEPOT, INC.,<br><br>Nominal Defendant. | CASE NO.:<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## INTRODUCTION

Plaintiff Haydon Modglin ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant loanDepot, Inc. ("loanDepot" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (as defined below) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsels' investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by loanDepot with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by loanDepot; (iii) two purported class action lawsuits filed in the United Stated District Court for the Central District California captioned *Doban v. loanDepot, Inc., et al.*, Case 8:21-cv-01513 (C.D. Cal.) and *Lako v. loanDepot, Inc., et al.*, Case 8:21-cv-01449 (C.D. Cal.) (the "Securities Class Actions") alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading with respect to loanDepot's business model; (iv) a wrongful termination action captioned *Richards vs. loanDepot, Inc., et al.*, Case No. 30-2021-01222421-CU-WT-CJC filed in the Superior Court of California, County of Orange (the "Richards Action"); and (v) other publicly available information, including media and analyst reports, concerning loanDepot.

## NATURE OF THE ACTION

1. This is a stockholder derivative action asserting claims for breach of fiduciary duty and violations of sections 10(b) and 21D of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), brought on behalf of nominal

defendant loanDepot against certain officers and members of the Company's Board of Directors (the "Board").

2. loanDepot, is a Lake Forest, California-based holding company which sells mortgage and non-mortgage lending products. loanDepot was founded in 2010 by Defendant Anthony Hsieh ("Hsieh").

3. In 2020, loanDepot broke $100 billion of mortgage originations for the first time, with just under 300,000 loans originated. loanDepot went public on the New York Stock Exchange on February 11, 2021.

4. Plaintiff alleges that at the direction of the Individual Defendants, the Registration Statement and its amendments (collectively, the "Registration Statement") and Prospectus incorporated therein (collectively, the "Offering Documents") issued in connection with the Company's initial public offering ("IPO"), as well as the Form 10-K filed by the Company on March 16, 2021 for the fiscal year ended December 31, 2020 (the "2020 10-K"), contained materially incorrect or misleading statements and/or failed to disclose material information.

5. In its IPO, loanDepot sold 3,850,000 shares of its Class A common stock to the public at a price of $14.00 per share for total proceeds of approximately $54 million, net of underwriting discounts and commissions.

6. On February 16, 2021, the Company filed its Prospectus on Form 424B4 with the SEC.

7. loanDepot's Prospectus issued in connection with the IPO described the Company as follows:

> loanDepot is a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform designed around the consumer that has redefined the mortgage process. Our digital- first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S.

> We are the second largest retail-focused non-bank mortgage originator and the fifth largest overall retail originator, according to Inside Mortgage Finance. […] Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot. We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding principle is to delight our customers by exceeding their expectations. […] We are a data driven company. We utilize data from lead acquisition, digital marketing, in market relationships, and our servicing portfolio to identify and acquire new customers and retain our existing customers. During the last twelve months, we have analyzed, enriched, and optimized more than 9 million customer leads with a deep understanding of each potential customer's financial profile and needs. We also maintain mello DataMart, an extensive proprietary data warehouse of over 38 million contacts generated over our ten-year history. Our predictive analytics, machine learning and artificial intelligence drive optimized lead performance. […] Our national brand along with our expertise in digital marketing, big data and marketing analytics, not only drives new customer acquisition, but also maximizes retention and customer lifetime value. We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions. … Our platform and technology create a significant financial advantage. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability.

8. The Offering Documents were negligently and/or recklessly prepared by the Individual Defendants and omitted to disclose material adverse facts. Specifically, the Individual Defendants caused the Company to fail to disclose that: (1) its refinance originations had already declined substantially at the time of the IPO due to industry over-capacity and increased competition; (2) its gain-on-sale margins had already declined substantially at the time of the IPO; (3) as a result, its revenue and growth would be negatively impacted; and (4) as a result of the foregoing, its positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

9. The 2020 10-K went on to state many of these same falsehoods.

10. The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by willfully engaging in the deceptions alleged herein.

11. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, loanDepot has sustained damages as described below.

**JURISDICTION AND VENUE**

12. Pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 21D of the Exchange Act. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

13. The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in California or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains executive offices in this District, including Nominal Defendant loanDepot, a substantial portion of the transactions and wrongs complained of herein – including Defendants' (defined below) primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to loanDepot – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

15. In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

**PARTIES**

16. Plaintiff is a stockholder of loanDepot and has been a stockholder of loanDepot continuously since February 2021.

17. Nominal Defendant loanDepot is a corporation with principal executive offices located at 26642 Towne Centre Drive, Foothill Ranch, California.

18. Defendant Hsieh is the founder, Chairman, and Chief Executive Officer ("CEO") of the Company, and signed or authorized the signing of the Company's Offer Documents and signed the 2020 10-K filed.

19. Defendant Patrick Flanagan ("Flanagan") is the Chief Financial Officer ("CFO") of the Company, and signed or authorized the signing of the Company's Offer Documents and signed the 2020 10-K.

20. Defendant Nicole Carrillo ("Carrillo") is the Chief Accounting Officer and an Executive Vice President of the Company, and signed or authorized the signing of the Company's Offer Documents and signed the 2020 10-K.

21. Defendant Andrew C. Dodson ("Dodson") is a director of the Company, and signed a consent form dated January 11, 2021 authorizing his name to be included in the Company's Registration Statement as a director nominee of loanDepot. Dodson also signed the 2020 10-K and has served as a director of the Company or its affiliate, loanDepot.com, LLC, since December 2009. He is a member of the Board's Audit Committee.

22. Defendant John C. Dorman ("Dorman") is a director of the Company, and signed a consent form dated January 11, 2021 authorizing his name to be included in the Company's Registration Statement as a director nominee of loanDepot. Dorman also signed the 2020 10-K and has served as a director of the Company or its affiliate,

loanDepot.com, LLC, since July 2015. He is a member of the Board's Compensation Committee and Chairman of its Audit Committee and its Governance and Nominating Committee.

23. Defendant Brian P. Golson ("Golson") is a director of the Company, and signed a consent form dated January 11, 2021 authorizing his name to be included in the Company's Registration Statement as a director nominee of loanDepot. Golson also signed the 2020 10-K and has served as a director of the Company or its affiliate, loanDepot.com, LLC, since December 2009.

24. Defendant Dawn Lepore ("Lepore") is a director of the Company, and signed a consent form dated January 11, 2021 authorizing her name to be included in the Company's Registration Statement as a director nominee of loanDepot. Lepore also signed the 2020 10-K and has served as a director of the Company or its affiliate, loanDepot.com, LLC, since July 2015. She is a member of the Board's Audit Committee and the Governance and Nominating Committee and Chairman of the Compensation Committee.

25. Defendants Hsieh, Flanagan, Carrillo, Dodson, Dorman, Golson and Lepore are collectively referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

26. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

28. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of LoanDepot were required to, among other things:

- ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;
- conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
- properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and
- ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

29. Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

30. In addition, the Company has also adopted a Code of Ethics (the "Code"). The Code states in its preamble:

> The Board of Directors (the "Board") of loanDepot, Inc. (together with its subsidiaries, the "Company") has adopted this Code of Ethics (the "Code") in order to deter wrongdoing and promote:
>
> 1. honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
>
> 2. full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

3. compliance with applicable governmental laws, rules and regulations;

4. the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

5. accountability for adherence to the Code.

All directors, officers and employees are required to be familiar with the Code, comply with its provisions and report any suspected violations as described below.

31. The Code goes on to state:

**HONEST AND ETHICAL CONDUCT**

The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.

Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

**COMPLIANCE**

Directors, officers and employees should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities and states in which the Company operates.

Although not all directors, officers and employees are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Questions about compliance should be addressed to the Legal Department.

Insider trading is unethical, illegal and a violation of the Company's Insider Trading Policy.

**DISCLOSURE**

The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and

> internal audit departments, as well as the Company's independent public accountants and counsel.
>
> Each director, officer and employee who is involved in the Company's disclosure process must:
>
> 1. be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and
>
> 2. take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

32. In addition, the Audit Committee is specifically tasked with making sure the Company's SEC filings are accurate and complete. The Audit Committee's Charter states in pertinent part:

> **PURPOSE**
>
> The purpose of the Audit Committee (the "Audit Committee") of the board of directors (the "Board") of loanDepot, Inc. (the "Company") is to assist the Board with oversight of:
>
> 1. the integrity of the Company's financial statements,
>
> 2. the systems of internal accounting and financial controls,
>
> 3. compliance with legal and regulatory requirements,
>
> 4. the Company's independent auditor's qualifications and independence, and
>
> 5. the performance of the Company's independent auditor and internal audit function, if any.
>
> * * *
>
> **DUTIES AND RESPONSIBILITIES**
>
> The Audit Committee shall have the following authority and responsibilities:
>
> 6. Internal Controls: To review with management, internal audit, and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud

involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditor disclosure relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

7. Risk Oversight: To review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.

8. Annual Financials: To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K before the Form 10-K is filed. The Audit Committee shall recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

11. Financial Statements Issues: To review with management and the Company's independent auditor: (1) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (2) analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements; (4) consideration of the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles; and (5) the completeness and clarity of the disclosures in the financial statements.

19. Code of Ethics: To monitor compliance with the Company's Code of Ethics (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code.

21. Legal Compliance: To review, with the General Counsel and outside legal counsel, legal and regulatory matters relating to the Company and its subsidiaries that could have a significant impact on the Company's financial statements; to review the Company's compliance with applicable laws and regulations; and to review and oversee the Company's policies, procedures and programs designed to promote and monitor legal and regulatory compliance and sustainability.

33. Moreover, Item 303 of SEC Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material, unfavorable impact on a company's operations.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

34. loanDepot is an independent retail mortgage lender that provides residential loans, refinance loans, and personal loan products nationwide. Founded in 2010 by Hsieh, the Company is purportedly "focused on creating a straightforward mortgage experience that meets—and exceeds—your expectations."

35. The Company has grown to become the nation's fifth largest retail mortgage lender and the second largest nonbank retail originator, funding more than $275 billion since inception. Today, loanDepot's nationwide team of 10,000-plus members assists more than 27,000 customers each month.

### MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED BY THE INDIVIDUAL DEFENDANTS

36. The Prospectus for the Company's IPO described the Company's business as follows:

> loanDepot is a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform designed around the consumer that has the mortgage process. Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S. […]
>
> Consumer-facing industries continue to be disrupted by technological innovation. The mortgage industry is no different with consumers expecting increased levels of convenience and speed. ***The residential mortgage market in the U.S. is massive— with approximately $11.0 trillion of mortgages outstanding as of September 30, 2020—and is largely served by legacy mortgage originators, which require consumers to navigate time-consuming and paper-based processes to***

***apply for and obtain mortgage loans. mello®, our proprietary end-to-end technology platform, combined with our differentiated data analytics capabilities and nationally recognized consumer brand, uniquely positions us to capitalize on the ongoing shift towards at-scale, digitally-enabled platforms.*** […]

***Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot.*** We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding principle is to delight our customers by exceeding their expectations.

We are a data driven company. We utilize data from lead acquisition, digital marketing, in-market relationships, and our servicing portfolio to identify and acquire new customers and retain our existing customers. During the last twelve months, we have analyzed, enriched, and optimized more than 9 million customer leads with a deep understanding of each potential customer's financial profile and needs. We also maintain mello DataMart, an extensive proprietary data warehouse of over 38 million contacts generated over our ten-year history. Our predictive analytics, machine learning and artificial intelligence drive optimized lead performance.

We leverage our brand, technology and data to serve customers across our two interconnected strategies: Retail and Partner. Our Retail strategy focuses on directly reaching consumers through a combination of digital marketing and more than 2,000 digitally-empowered licensed mortgage professionals. In our Partner strategy, we have established deep relationships with mortgage brokers, realtors, joint ventures with home builders, and other referral partners.

These partnerships are valuable origination sources with lower customer acquisition costs. Our technology is a key component of the value proposition to these partner relationships, allowing us to integrate directly into our partners' native systems. We maintain integrated referral relationships with several leading brands, including a partnership with one of the 10 largest U.S. retail banks by total assets. During 2019, our Retail strategy produced 72% of our origination volume, with our Partner strategy representing the remaining 28%.

Our digital-first approach across our Retail and Partner strategies leverages the power of mello® to create a streamlined experience for consumers. Our predictive models route leads to the right loan officer at the right time to optimize the consumer's experience and best serve their needs. Based on each consumer's needs and preferences, leads are directed to in-house or in-market loan officers, team members at our centralized operations locations, or our digital self-service platform. Our in- market loan officers are able to leverage their long-term relationships as well as our proprietary mello® platform and loanDepot brand, driving improved profitability per loan officer.

Our national brand along with our expertise in digital marketing, big data and marketing analytics, not only drives new customer acquisition,

but also maximizes retention and customer lifetime value. We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions. ***Our recapture rates are among the highest in the industry — for the nine months ended September 30, 2020, our organic refinance consumer direct recapture rate was 61% highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18% for the three months ended September 30, 2020 according to Black Knight Mortgage Monitor. In addition, we achieved an overall organic recapture rate of 47% for the nine months ended September 30, 2020. Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.***

***We have significantly increased our originations market share from 1.0% in 2014 to 2.6% for the first nine months of 2020, and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share. Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations representing 41% of total originations in 2019***. We have a well-defined plan to accelerate this growth by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.

***Our platform and technology create a significant financial advantage***. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the investments we have made in our brand and our technology. ***For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and$ 1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry***.

[Emphasis added].

37. Prior to the IPO, the Company was majority owned by Defendant Hsieh, who owned 61%, while Parthenon Capital ("Parthenon") owned 38%, as reflected in the following chart:

| Name of Beneficial Owner | Class A Common Stock Beneficially Owned after giving effect to the Reorganization Transactions (on a fully exchanged and converted basis) (1) (2) | | | | | | Class D Common Stock Beneficially Owned after giving effect to the Reorganization Transactions (on a fully exchanged and converted basis) (1) (3) | | | | | | Combined Voting Power (4) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Before This Offering | | After This Offering | | After This Offering & Option Exercise | | Before This Offering | | After This Offering | | After This Offering & Option Exercise | | Before This Offering | After This Offering | After This Offering & Option Exercise |
| | # | % | # | % | # | % | # | % | # | % | # | % | % | % | % |
| Entities affiliated with Parthenon Capital (5) | 124,810,608 | 38.4% | 123,309,280 | 37.9% | 123,084,080 | 37.9% | 121,368,600 | 37.6% | 119,912,600 | 37.1% | 119,694,200 | 37.1% | 38.6% | 38.5% | 38.5% |
| *Executive Officers and Directors:* | | | | | | | | | | | | | | | |
| Anthony Hsieh (6) | 130,837,895 | 40.3% | 129,128,832 | 39.7% | 128,872,472 | 39.7% | — | — | — | — | — | — | 61.3% | 61.1% | 61.1% |
| Patrick Flanagan (7) | — | — | — | — | | | — | — | — | — | — | — | | * | |
| Jeff Walsh (7) | — | — | — | — | | | — | — | — | — | — | — | | * | |
| Jeffrey DerGurahian (7) | — | — | — | — | | | — | — | — | — | — | — | | * | |
| Brian Golson (8) | — | — | — | — | | | — | — | — | — | — | — | | * | |
| Andrew Dodson (8) | — | — | — | — | | | — | — | — | — | — | — | | * | |
| John Dorman (7) | — | — | — | — | | | — | — | — | — | — | — | | * | |
| Dawn Lepore (7) | — | — | — | — | | | — | — | — | — | — | — | | * | |
| Nicole Carrillo (7) | — | — | — | — | | | — | — | — | — | — | — | | * | |
| Executive Officers and Directors as a group (9 person | 130,837,895 | 40.3% | 129,128,832 | 39.7% | 128,872,472 | 39.7% | — | — | — | — | — | — | 61.3% | 61.1% | 61.1% |

38. The Company's IPO was a means for the Company's controlling stockholder, Defendant Hsieh, and the Company's early partner and investor, Parthenon, to cash out their illiquid stock in the Company. Of the IPO proceeds, the Company's insiders (Defendant Hsieh and Parthenon) sold 1,456,000 shares of Class A Common Stock compared to 2,394,000 shares sold by the Company. Thus, the Company's insiders received approximately 38% of all proceeds from the IPO.

39. In addition, shortly before the IPO, the Company's insiders caused the Company to make large cash payments to them. In November 2020, the Company paid profit distributions of $278.8 million to certain of its unitholders, namely Defendant Hsieh and Parthenon. In December 2020, the Company distributed $71.1

million to the unitholders. In addition, shortly prior to the IPO, the Company's related entity LD Holdings distributed an additional $159 million to the unitholders. Moreover, on April 30, 2021 the Company distributed an additional $146.2 million to the unitholders. Thus, shortly before and/or after the IPO, ***the Company's insiders siphoned off over $655 million in cash from the Company***.

40. On November 12, 2020, the Company filed a draft Registration Statement on Form DRS with the SEC.

41. On January 11, 2021, the Company filed a draft Registration Statement on Form S-1 with the SEC. Following several amendments made in response to comments received by the SEC, the SEC declared the Registration Statement effective on February 10, 2021.

42. On February 16, 2021, loanDepot filed the Prospectus with the SEC on Form 424B4. The Registration Statement and Prospectus were utilized in the Offering.

43. Defendants Hsieh, Dodson, Dorman, Golson, and Lepore signed the Registration Statement or signed consent forms dated January 11, 2021 authorizing their names to be included in the Registration Statement as director nominees of loanDepot.

44. loanDepot thereafter announced the pricing of its IPO of 3,850,000 Class A shares at a price of $14 per share. The Company announced that its shares had been approved for listing on the NYSE under the symbol "LDI."

45. The Offering Documents used to effectuate the Company's IPO were negligently prepared and contained false and misleading statements and material omissions.

46. The Registration Statement stated that the Company's "innovative technology" had allowed it to realize significantly increased revenues and profitability:

> "We have demonstrated our ability to grow our business and market share, having grown from a de novo start-up in 2010 to the second largest

non-bank retail originator in the U.S. with a 2.6% share of a $11.0 trillion mortgage market as of September 30, 2020. We believe that we are well positioned to continue our market share growth through both our Retail strategy, where we have invested in our team members and technology to enable rapid scaling, and our Partner strategy, where independent brokers, in addition to joint venture and integrated referral partners, increasingly choose to work with us based on our reputation for excellent customer service and seamless user experiences. ***Our growth has accelerated in recent quarters as our long-term investments in brand marketing and innovative technology have helped us achieve industry-leading growth and profitability***.

"We believe that ***continuing to make these investments will allow us to grow market share, increase customer retention and deliver enhanced returns that will ultimately enable a virtuous cycle of further investment and returns.***"

[Emphasis added].

47. The Offering Documents contained the following chart representing to investors that loanDepot had experienced rapidly increasing loan origination growth:




48. The Offering Documents also stated:

We've created a company that is built to serve customers throughout the entire loan transaction, from the onset of the purchase or refinance decision through loan closing and servicing. ***We now possess roughly 3% market share of annual mortgage origination volumes***, which makes up part of the $11T total addressable market. Thanks to our brand investment over time, we are also one of the most recognized brands in the industry today. ***All of this gives us enormous runway***.

[Emphasis added].

49. The Prospectus stated:

> We originated $79.4 billion of loans for the twelve months ended September 30, 2020 and ***experienced 116% year-over-year origination volume growth for the nine months ended September 30, 2020.***

[Emphasis added].

50. In another section of the Offering Documents discussing potential competition, the Company represented that its brand and technology protected it against potential competition and that there were significant barriers to entry:

> We believe that we are one of only two non-banks with a nationally-recognized consumer brand in the U.S. retail mortgage origination industry. Since the Company's launch in 2010, we have invested over $1.2 billion in marketing and the promotion of our brand, and we believe there are significant barriers-to-entry in creating a brand comparable to ours.

51. The Offering Documents also trumpeted loanDepot's success in achieving higher than-average recapture rates and profit margins in its industry, and stated that loanDepot was well positioned to protect its high profit margins:

> ***Our recapture rates are among the highest in the industry***—for the nine months ended September 30, 2020, ***our organic refinance consumer direct recapture rate was 61% highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18% for the three months ended September 30, 2020*** according to Black Knight Mortgage Monitor. In addition, we achieved an overall organic recapture rate of 47% for the nine months ended September 30, 2020. Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.

[Emphasis added].

52. The Prospectus also stated that loanDepot had significantly increased its market share and was well-positioned to protect and grow that market share through its proprietary "platform and technology" which gave loan Depot a "significant financial advantage":

> ***We have significantly increased our originations market share from 1.0% in 2014 to 2.6% for the first nine months of 2020, and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share***. Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations representing 41% of total originations in 2019. ***We have a well-defined plan to accelerate this growth*** by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.
>
> ***Our platform and technology create a significant financial advantage***. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the investments we have made in our brand and our technology. For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and $1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry.

[Emphasis added].

53. The Offering Documents represented the following with respect to the Company's gain-on-sale margins:

> While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand. Market demand in 2020 was driven by a prolonged period of historically low interest rates. This demand contributed to gain on sale margins reaching levels that the Company does not believe will be sustained in future years and could result in decreases in revenue.

54. This statement was false and misleading because the Company was already experiencing lower gain-on-sale margins. Instead of disclosing this existing fact, the Offering Documents falsely stated that gain-on-sale margins and revenues could be impacted "in future years," when in fact the margins and revenues ***had***

***already been adversely affected*** and would continue to be affected in the very next quarter (not year).

55. The representations in the Offering Documents were also false and misleading because, at the time of the IPO, loanDepot was already experiencing significantly increased competition, greatly reduced originations, and lower gain-on sale margins. Neither loanDepot's supposedly proprietary technology or platform or other touted advantages were proving successful in fighting this competition. Instead, the Individual Defendants concealed from the Offering Documents the fact that loanDepot was being forced to lower prices/rates to combat the significantly increased competition, which was leading and would inexorably lead to lower margins and profits. In addition, its efforts to protect its market share by reducing prices/rates were not enough to protect its loan originations, which were declining and thus leading to reduced revenue. loanDepot failed to disclose these material facts in the Offering Documents, thus making the statements above misleading.

56. The Individual Defendants made similar statements in the Company's 2020 10-K. Specifically, the 2020 10-K reiterated the following:

> Our Company
>
> We are a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform, designed around the consumer that has redefined the mortgage process. ***Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S. We are the second largest retail-focused non-bank mortgage originator and the fourth largest overall retail originator, according to Inside Mortgage Finance. For the year ended December 31, 2020, we generated $100.8 billion in originations (122% year-over-year growth), $4.3 billion in revenue (222% year-over-year growth), and $2.0 billion in net income.***
>
> Consumer-facing industries continue to be disrupted by technological innovation. The mortgage industry is no different with consumers expecting increased levels of convenience and speed. ***The residential mortgage market in the U.S. is massive—with***

***approximately $11.1 trillion of mortgages outstanding as of December 31, 2020 and is largely served by legacy mortgage originators, which require consumers to navigate time-consuming and paper-based processes to apply for and obtain mortgage loans. mello®, our proprietary end-to-end technology platform, combined with our differentiated data analytics capabilities and nationally recognized consumer brand, uniquely positions us to capitalize on the ongoing shift towards at-scale, digitally-enabled platforms.***

***Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot.*** We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding principle is to delight our customers by exceeding their expectations. Since the Company's launch in 2010, we have invested over $1.3 billion in marketing and the promotion of our brand, and we believe there are significant barriers-to-entry in creating a brand comparable to ours. *mello*® drives streamlined customer experiences and operational efficiency throughout the entire lifecycle of a mortgage loan, including fully digital capabilities for customer acquisition, application, processing, and servicing. Our front-end interface is intuitive and user-friendly, driving high customer engagement and lower acquisition costs. *mello*® also powers our back-end technology, automating and streamlining numerous functions for our customers, team members and partners.

*     *     *

Marketing Strategy

Our national brand along with our expertise in digital marketing, big data, and marketing analytics, not only drives new customer acquisition, but also maximizes retention and customer lifetime value. ***We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions. Our recapture rates are among the highest in the industry. Our organic refinance consumer direct recapture rate for the year ended December 31, 2020 was 63%—highlighting the efficacy of our marketing efforts and the strength of our customer relationships.*** We define organic refinance consumer direct recapture rate as the total UPB of loans in our servicing book that are paid in full for purposes of refinancing the loan on the same property, with the Company acting as lender on both the existing and new loan, divided by the UPB of loans in our servicing book that paid in full for the purpose of refinancing the loan on the same property. ***This compares to an industry average retention rate of only 18% for the quarter ended December 31, 2020 according to Black Knight's January 2021 Mortgage Monitor.*** The terms "recapture" and "retention" can be used synonymously by industry participants. ***In addition, we achieved an overall organic recapture rate of 57% for the year ended December 31, 2020.*** Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.

> We engage in multiple targeted direct marketing strategies among our Retail and Partner strategies enhancing our customer acquisition effectiveness. We utilize online lead aggregators to acquire quality customer leads in bulk at attractive prices. Our organic digital marketing approach employ various digital strategies such as SEO, pay-per-click, banner advertising and organic content to generate organic online leads. We employ targeted direct marketing strategies including direct mailing to broaden our reach of consumers. In situations where we have an existing customer relationship, we use data-driven marketing campaigns to generate new business from customers in our servicing portfolio. We are also able to leverage our mortgage professionals' and partners' existing and newly-developed relationships with customers and referral partners to generate origination volume.

57. The representations in the 2020 10-K were also false and misleading because, at the time of its filing, loanDepot was already experiencing significantly increased competition, greatly reduced originations, and lower gain-on sale margins. Neither loanDepot's supposedly proprietary technology or platform or other touted advantages were proving successful in fighting this competition. Instead, the Individual Defendants concealed from investors in the 2020 10-K the fact that loanDepot was being forced to lower prices/rates to combat the significantly increased competition, which was leading and would inexorably lead to lower margins and profits. In addition, its efforts to protect its market share by reducing prices/rates were not enough to protect its loan originations, which were declining and thus leading to reduced revenue loanDepot failed to disclose these material facts in the 2020 10-K, thus making the statements above misleading.

**THE TRUTH IS REVEALED**

58. Indeed, when loanDepot announced disappointing second quarter 2021 results on August 3, 2021, Defendant Hsieh admitted that everything about loanDepot's business is "highly predictable" and thus that loanDepot had perfect visibility at the time of the IPO as to where its business was and was going. On the conference call with analysts to discuss loanDepot's second quarter 2021 earnings on August 3, 2021, Defendant Hsieh stated: "James, this is certainly not our first rodeo.

***Everything here is highly predictable. There's been very, very little surprise***." [Emphasis added].

59. The Individual Defendants never disclosed this information in the Offering Documents or the 2020 10-K. This omitted information was material because the Company's loan originations, growth rate, and margins were highly material to investors. Indeed, the entire business of loanDepot is loan originations and loan refinancing and thus the misrepresentations and omissions alleged herein concerned the Company's core (and only) product.

60. loanDepot had its lawyers draft boilerplate disclosures that it could use in the future to try to argue that the undisclosed facts were actually disclosed. The following generic and misleading disclosure in the Offering Documents was included by loanDepot for exactly this purpose:

> "Our loan originations, particularly our refinance mortgage loan volume, are dependent on interest rates and are expected to decline ***if interest rates increase***. Our loan origination activities are also subject to overall market factors that can impact our ability to grow our loan production volume. For example, ***increased competition*** from new and existing market participants, slow growth in the level of new home purchase activity or reductions in the overall level of refinancing activity ***can impact our ability to continue to grow our loan origination volume, and we may be forced to accept lower margins in order to continue to compete and keep our volume of activity consistent with past or projected levels***.
>
> [Emphasis added].

61. The same exact generic and misleading disclosure is contained in the 2020 10-K.

62. These alleged disclosures were themselves false and misleading. Telling investors that potential, theoretical increased competition "could" impact revenues and margins is a far cry from telling investors that the Company ***was already experiencing*** significantly increased competition that had already forced it to accept lower margins to stave off such competition. Moreover, interest rates did not increase

from the time of the IPO to the Company's announcement of significantly reduced revenues and margins in the second quarter 2021 (less than six months after the IPO). Interest rates stayed flat and even were lowered during this time period. Thus, the Company's boilerplate alleged disclosures in the Offering Documents and 2020 10-K actually misled investors rather than warning them about known, existing facts, which the Individual Defendants had an obligation to do under the federal securities laws.

63. Rather than disclose the known, existing adverse facts, the Offering Documents and the 2020 10-K repeatedly touted the fact that the Company had been extremely successful (even during Covid) of increasing market share, profit margins, and staving off competition:

> While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand. We have highlighted below the key steps we have undertaken since the onset of the pandemic to position our platform for continued success:
>
> Maintained higher liquidity levels from an increase in cash from retained earnings.
>
> Increased our total loan funding capacity with our current lending partners.
>
> Stepped up protocols related to verification of key metrics such as employment and income to ensure the highest quality underwriting standards are maintained.
>
> Transitioned our workforce to working remotely as of March 19, 2020.[1]

64. The Company's Offering Documents and the 2020 10-K both represented that the Company was experiencing rapid growth in revenues and margins and that the Company's business performance, prospects, and products were well-positioned to continue such high growth rate and margins, while omitting these known

[1] *See* Prospectus at p. 106.

trends and facts that had already had a materially unfavorable impact on the Company's revenues and business at the time of the IPO and after.

65. The Offering Documents and the 2020 10-K contained pages and pages of numerous generalized possible "Risk Factors" that might occur and "[i]n case" they did actually occur, then loanDepot's financial condition and results of operation "could be adversely affected." Those statements were false or misleading and omitted material information for the reasons stated above in paragraph 62.

66. The statements identified above that the Company made in the Offering Documents and the 2020 10-K were materially false and misleading when made because, in addition to what was stated above, they failed to disclose that: (i) the Company's refinance originations had already declined substantially at the time of the IPO due to industry over-capacity and increased competition; (ii) the Company's gain-on-sale margins had already declined substantially at the time of the IPO; (iii) as a result, the Company's revenue and growth would be negatively impacted; (iv) the Company had already been forced to embark on a significant expense reduction plan due to the significantly lower growth and refinance originations that the Company was experiencing; (v) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis; and (vi) the Company's business, prospects and ability to achieve growth had been materially impaired by the time of the IPO as a result of adverse industry, sales, and earnings trends.

67. Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), required the Individual Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17

C.F.R. § 229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and that each risk factor "adequately describes the risk." The failure of the Offering Documents to disclose that the Company was experiencing adverse growth and earnings trends, including significantly increased competition in the market for loan originations, reduced gain-on-sale margins, and lower revenues, violated 17 C.F.R. § 229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This failure also violated 17 C.F.R. § 229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in shares of the Company's common stock speculative or risky.

68. By August 17, 2021, loanDepot's stock had declined 42% from its IPO after it disclosed disappointing second quarter 2021 results and provided significantly lower guidance for its business.

69. At the time of the filing of this action, loanDepot's stock was trading in the range of $5 per share, having plummeted in response to information reflecting the materialization of significant risks misrepresented and omitted from the Offering Documents and the 2020 10-K as alleged herein.

**THE RICHARDS ACTION**

70. The Richards Action was filed on September 21, 2021. The complaint filed by Tamara "Tammy" Richards (the "Richards Complaint") confirms that the Individual Defendants knew exactly what they were doing in connection with the false and misleading statements referenced in the Offering Documents and the 2020 10-K.

71. As noted in the Richards Complaint, Ms. Richards was hired by LOANDEPOT.COM, LLC ("LDLLC") to serve as its Chief Operating Officer

("COO") in approximately February of 2018. Ms. Richards was offered a base salary of $400,000 per year, a signing bonus of $250,000, a guaranteed bonus of $400,000 for 2018, with an additional performance bonus that may be issued in the amount of $400,000 per year. Furthermore, Loan Depot granted to Ms. Richards 44,337,913 Class V Units pursuant to a Certain Unit Grant Agreement dated October 22, 2018 (the "UGA"). Upon Ms. Richards joining LDLLC, she would become the only woman to serve in a C-Suite or upper-level management position. ¶18.[2]

72. Ms. Richards was the architect of "Mello Ops" and "Mello Smart Loan", which utilized proprietary software based upon cutting-edge algorithms. Ms. Richards recognized that to be an industry leader, and to separate itself from its competitors, LDLLC had to fully embrace the advancements in "deep tech" and implement these technological breakthroughs into its loan processing system, by creating the industry's first and only fully functioning mortgage automation software. ¶19.

73. At the time of Ms. Richards hiring, defendant Hsieh already had an eye on taking loanDepot public. In addition to being well compensated, Hsieh promised all C-Suite executives that in the event that LDLLC went public each of the C-Suite level executives would receive a significant increase in bonuses, including an increase in the annual cash bonus, and a one-time discretionary bonus. ¶23.

74. However, it was not long before Ms. Richards began to grow concerned about Defendant Hsieh's behavior, especially his "willingness to cross ethical and fiduciary boundaries, to satisfy his greed and obsession with being number one." ¶32., Richards believed that it would be only a matter of time before Hsieh would begin to take a "by any means necessary" approach for the purpose of fraudulently inflating loanDepot's value. ¶32.

---

[2] All "¶_" notations reference paragraphs contained in the Richards' Complaint, attached hereto and made part hereof as Exhibit A.

75. Ms. Richards' concerns about Hsieh's ethics stemmed from a recent decision made by him to unjustly enrich loanDepot, through its subsidiary Closing USA, LLC ("CUSA"), rather than return the ill-gotten gains rightfully owed to their customers, as described below. ¶33.

76. As noted in the Richards Complaint, "in November 2019, Ms. Richards had discovered that between at least 2016 and 2019, loanDepot and CUSA were charging loan refinance borrowers double daily interest or per diem as a result of CUSA's failure to timely pay off the original loans, as both the new loan and old loan would both pay per diem until the old loan was paid off." ¶34.

77. "Ms. Richards raised this issue to Hsieh and Peter MacDonald, the Company's General Counsel, but was later informed that Hsieh had made the calculated decision that they would only return some of the money to borrowers in states that had attorneys general that were more diligent in enforcing compliance, whereas the CUSA would not return any money to customers in those states whose attorneys general would likely not discover the issue. As a result, Hsieh made the unscrupulous decision to convert its borrowers' funds rather than return those monies to the Company's customers who placed their faith in the loanDepot." ¶35.

78. The Richards Complaint went on to note:

> Hsieh's tight rope walk across ethical and legal boundaries finally crossed the line in August of 2020, as Hsieh moved forward with his plan that would ultimately constitute one of the most egregious ***wide scale fraud for profit schemes*** since the months and years leading up to the Great Recession. Having seen the pain endured by Americans and the devastation caused to the U.S. economy during the Great Recession as a result of unbridled greed and corruption that poisoned the mortgage industry from its executives to its loan brokers, Ms. Richards would soon witness Hsieh and other loanDepot executives become fully infected by this disease, as making money took precedent over any other considerations. (Emphasis in the original). ¶36.

79. From there, things only got worse at loanDepot:

> On or about August 26, 2020, Hsieh finally began to initiate his wide scale fraud for profit scheme. During a production meeting in which Ms. Richards was present, Hsieh began to scream, "I am Mello Clear, and we must immediately close loans regardless of documentation!" Hsieh had informed the sales team that they were not closing enough loans, and that sales "should not stand for this." Hsieh's actions essentially declared open season on Operations by the sales team. ¶42.

80. As noted by Ms. Richards, "Hsieh's urging of the production team to close loans without documentation was illegal." ¶45.

81. Per Richards, Hsieh continued to push for better results through lower standards:

> [H]e [Hsieh] caused the Company to conduct a full-scale investigation to determine if underwriting was over conditioning, by denying loan applicants due to more conservative guidelines and standards, that would otherwise be approved. The results of the investigation would prove to show that Hsieh's belief was in fact unfounded. However, despite his baseless claims that the Company was underperforming as a result of operations somehow hampering loan approvals, Hsieh continued on his path of disregard of legal guidelines and policies, purely for his own narcissistic and greed-driven satisfaction. ¶46.

82. This behavior by Defendant Hsieh continued unabated:

> On or about October 28, 2020, Hsieh once again flew into a hellish rage towards Ms. Richards. Hsieh began screaming, "close all loans…close without credit reports…close without documentation…close all loans!" He continued, "we are setting records every month and have grown staffing and capacity, but it's not enough! Trust our borrowers and close loans without documents! I already paid taxes on these loans and the loans are already shown as revenue!" In response to Hsieh's maddening rant, Ms. Richards told Hsieh that she cannot and will not close loans without credit reports. ¶47.

83. However, not all loanDepot employees and executives had the nerve to stand up to Defendant Hsieh like Richards did:

> During this time, and following the discovery, Tomo Yebisu ("Yebisu") had begun to implement the "Tomo Promo" in order to get sales associates to close "no-doc" loans. The "Tomo Promo" was a phrase commonly used throughout the Company, where Yebisu would go on to the sales floor with $100 bills and push the sales agents for increased production numbers while he would exclaim that he would "make it rain" dollars for those over performing sales agents. Ms. Richards spoke with Yebisu and informed him that what he and Hsieh were doing was wrong, and that Hsieh was treating her abusively. In response, Yebisu stated that "it is Hsieh's company, and "we are required to do whatever he tells us to do," "we have no choice." Richards retorted Yebisu's response by stating "we do have choices when it comes to doing the right thing." ¶48.

84. According to Richards, "Yebisu's response was typical of the entire management team, and all employees of loanDepot for that matter. Hsieh had a cutthroat and ruthless reputation, and regardless of whether or not Hsieh's directives were legal or ethical, like a dictatorship, loanDepot employees blindly followed directives of their leader." ¶49.

85. During this push to close loans by any means necessary, loanDepot had already begun the official process to pursue an initial public offering. In or around early October 2020, the Company initiated its pursuit of the IPO by filing the Registration Statement with the SEC. The Company began to speculate that the value of such an IPO would range between $10 billion and $17 billion. ¶57.

86. This push to take the Company public seemed to cause Defendant Hsieh to push even harder to improve loanDepot's numbers. As noted in the Richards Complaint:

> On November 17, 2020, Hsieh initiated "Project Alpha." Ms. Richards would learn from Walsh that Project Alpha was a scheme in which Hsieh would personally identify 8,000 + loans, that would be closed without documentation. Hsieh identified 200 processors that would have super authority to close these loans without documentation, and in exchange

these processors would receive extra bonuses if those loans closed by the end of November. ¶66.

87. Ms. Richards alleged that more recently, as a result of the non-compliant loans processed through Project Alpha, loanDepot has had to write-down those loans, because of the problems associated with them, causing the Company to miss its quarterly profit projections. ¶83.

88. It is clear from the Richards' Complaint that the Individual Defendants took extraordinary, and likely illegal, measures to artificially inflate loanDepot's loan inventory in anticipation of its IPO. The foregoing misconduct was concealed from investors in the Offering Documents and the 2020 10-K.

## DAMAGES TO LOANDEPOT

89. As a result of the Individual Defendants' wrongful conduct, loanDepot disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated loanDepot's credibility. loanDepot has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

90. Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected loanDepot to incur costs and expenses in the Securities Class Actions and the Richards Action.

91. As a direct and proximate result of the Individual Defendants' actions as alleged above, loanDepot's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

92. Moreover, these actions have irreparably damaged loanDepot's corporate image and goodwill. For at least the foreseeable future, loanDepot will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing

public, such that loanDepot's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

93. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

94. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

95. Plaintiff is an owner of loanDepot common stock and was an owner of loanDepot common stock at all times relevant hereto.

96. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

97. As a result of the facts set forth herein, Plaintiff has not made any demand on the loanDepot Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

98. The loanDepot Board is currently comprised of seven members: defendants Hsieh, Dodson, Dorman, Golson, and Lepore (the "Director Defendants"), and non-defendants Mike Linton and Pamela Hughes Patenaude. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### DEMAND IS FUTILE AS TO DEFENDANTS HSIEH, DODSON, DORMAN, GOLSON, AND LEPORE BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

99. Defendants Hsieh, Dodson, Dorman, Golson, and Lepore all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements,

and as such had a fiduciary duty to ensure that the Company's SEC filings and other public statements concerning its business, operations, prospects, internal controls, and financial statements were accurate.

100. Moreover, the Director Defendants, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

101. The Director Defendants' conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of loanDepot to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason demand is futile as to the Director Defendants.

102. Additionally, the Director Defendants all sat on the board of directors of LDLLC together and worked together to make loanDepot a public company. This time working together and the intertwinement of their relationships of taking loanDepot

public not only compromises their independence, but also increases the substantial likelihood that they will be found liable.

**DEFENDANT HSIEH LACKS INDEPENDENCE**

103. Defendant Hsieh is not disinterested for purposes of demand futility because his principal occupation is CEO and Chairman of the Board. According to the Company's Registration Statement, in 2019, Hsieh received total compensation of $1,254,779. This amount is material to him.

**DEFENDANTS HSIEH, DODSON, DORMAN, GOLSON, AND LEPORE LACK INDEPENDENCE**

104. The Director Defendants are incapable of considering a demand to commence and vigorously prosecute this action because they face additional substantial likelihood of liability as they are named defendants in the Securities Class Actions.

**DEFENDANTS HSIEH, DODSON, AND GOLSON LACK INDEPENDENCE**

105. Pursuant to the final Amended Registration Statement filed by the Company with the SEC on February 9, 2021, defendants Hsieh, Dodson, and Golson are not independent:

> Our board of directors has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment, and affiliations, our board of directors has determined that John C. Dorman and Dawn Lepore do not have a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is defined under the applicable rules and regulations of the SEC and the listing standards of the NYSE.

**GOLSON AND DODSON LACK INDEPENDENCE**

106. Golson is the Co-CEO and Managing Partner at Parthenon and has been with Parthenon since 2002. He has also served as a director of the company or its affiliate, LDLLC, since December 2009.

107. Dodson is a Managing Partner at Parthenon and has been with Parthenon since 2005. He has also served as a director of the company or its affiliate, LDLLC, since December 2009.

108. As noted in the Offering Documents:

> Immediately following the offering, the Parthenon Stockholders and the Continuing LLC Members will own approximately 98.9% of the combined voting power of our common stock (or 98.7% if the underwriters' option is exercised in full). Accordingly, the Parthenon Stockholders and the Continuing LLC Members, if voting in the same manner, will be able to control the election and removal of our directors and thereby determine our corporate and management policies, including potential mergers or acquisitions, payment of dividends, assets sales, amendment of our certificate of incorporation or bylaws and other significant corporate transactions for so long as the Parthenon Stockholders and the Continuing LLC Members retain significant ownership of us. This concentration of ownership may delay or deter possible changes in control of our company, which may reduce the value of an investment in our common stock. So long as the Parthenon Stockholders and the Continuing LLC Members continue to own a significant amount of our combined voting power, even if such amount is less than 50%, they will continue to be able to strongly influence or effectively control our decisions.

**DEMAND IS EXCUSED AS TO DEFENDANTS DODSON, DORMAN AND LEPORE BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

109. Defendants Dodson, Dorman, and Lepore, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowed the Individual Defendants to cause the Company to make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, Defendants Dodson, Dorman, and Lepore were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Defendants Dodson, Dorman, and Lepore, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and other financial information provided by the Company, as

required by the Audit Committee Charter. For this reason, demand is futile as to Defendants Dodson, Dorman, and Lepore.

**FIRST CAUSE OF ACTION**

**(Against the Individual Defendants for Breach of Fiduciary Duty)**

110. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

111. The Individual Defendants owed and owe loanDepot fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe loanDepot the highest obligation of good faith, fair dealing, loyalty, and due care.

112. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

113. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

114. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, loanDepot has sustained significant and actual damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

115. Plaintiff, on behalf of loanDepot, has no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act)**

116. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117. LoanDepot and the Individual Defendants are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the willful and/or reckless violations of the Individual Defendants of their obligations as officers and/or directors of loanDepot.

118. The Individual Defendants, because of their positions of control and authority as officers and directors of LoanDepot were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of loanDepot, including the wrongful acts complained of herein and in the Securities Class Actions.

119. Accordingly, the Individual Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u- 4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

120. As such, loanDepot is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of loanDepot, and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached their fiduciary duties and committed other violations to loanDepot, as alleged herein;

C. Awarding loanDepot the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

D. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

E. Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

F. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 21, 2022

Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

*/s/ Melissa A. Fortunato*
Melissa A. Fortunato (SBN 319767)
445 S. Figueroa Street, Suite 3100
Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506
Email: fortunato@bespc.com

*Attorney for Plaintiff*

**OF COUNSEL:**

Michael Hynes
Ligaya Hernandez
HYNES & HERNANDEZ, LLC
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (484) 875-9273

**VERIFICATION**

I, Haydon Modglin, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 119, 2022


Haydon Modglin (Jan 20, 2022 11:42 MST)

Haydon Modglin